No. 26-5262

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

**JAMIE GRAY,**
*Plaintiff-Appellant,*

v.

**LISA FARMER and LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT,**
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Eastern District of Kentucky
No. 5:23-cv-00112 (Hon. Karen K. Caldwell)

---

**AMICUS CURIAE BRIEF
OF NATIONAL CENTER FOR LGBTQ RIGHTS, GLBTQ LEGAL
ADVOCATES & DEFENDERS, AND ADVOCATES FOR TRANS
EQUALITY
IN SUPPORT OF PLAINTIFF-APPELLANT
AND IN SUPPORT OF REVERSAL**

AMY WHELAN
SHANNON MINTER
NATIONAL CENTER FOR LGBTQ
RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
(415) 392-6257
awhelan@nclrights.org
sminter@nclrights.org

SARAH PRESCOTT (P70510)
*Counsel of Record for Amici Curiae*
SALVATORE PRESCOTT PORTER &
PORTER, PLLC
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@sppplaw.com

*Counsel for Proposed Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A) and Sixth Circuit Rule 26.1, all Amici state that they are nonprofit organizations, have no parent corporation, and issue no stock. No publicly held corporation owns any interest in the Amici organizations.

/s/ Sarah Prescott
SARAH PRESCOTT (P70510)
*Counsel of Record for Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE .............1

STATEMENT REGARDING AUTHORSHIP AND FUNDING...........................3

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................4

ARGUMENT ....................................................................................7

   I.  A REASONABLE JURY COULD FIND THAT GRAY'S VISIBLE, DOCUMENTED VULNERABILITY MADE THE NEED TO PROTECT HIM PLAINLY OBVIOUS.........................................................................8

      A.  The deliberate-indifference inquiry turns on the obviousness of the risk to a vulnerable detainee..............................................................8

      B.  The defendants' own records documented the specific facts that made Gray's vulnerability visible and obvious. ........................................9

      C.  The danger was not speculative: federal data confirm that detainees who present as Gray did face acute risk, particularly from staff............................11

      D.  Under the objective standard governing pretrial detainees, the need to staff and monitor the facility was plainly obvious...................................12

  II.  PREA AND ITS REGULATIONS ARE EVIDENCE OF THE NEED FOR ADEQUATE STAFFING AND MONITORING, AND A JURY COULD FIND THAT THIS FACILITY GROSSLY DISREGARDED THAT NEED...................13

      A.  PREA's supervision-and-monitoring standard requires a documented staffing plan providing adequate staffing and video monitoring to protect detainees against sexual abuse. .........................................................13

      B.  Although PREA confers no private right of action, its standards are evidence of the foreseeability of the risk and of what reasonable officials should have done..........................................................................14

C.  A jury could find that this facility grossly disregarded those safeguards, maintaining neither adequate staffing nor functioning monitoring and adopting no PREA protocols at all. ...................................................15

CONCLUSION ..................................................................................................17

CERTIFICATE OF COMPLIANCE.....................................................................18

CERTIFICATE OF SERVICE ..............................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bd. of Cnty. Comm'rs v. Brown*,
 520 U.S. 397 (1997)..................................................................5, 7, 16

*Bishop v. Hackel*,
 636 F.3d 757 (6th Cir. 2011) ..................................................................8

*Brawner v. Scott County*,
 14 F.4th 585 (6th Cir. 2021) .......................................................4, 7, 14

*City of Canton v. Harris*,
 489 U.S. 378 (1989)......................................................4, 5, 7, 13, 16

*Connick v. Thompson*,
 563 U.S. 51 (2011)..............................................................................13, 16

*Doe v. District of Columbia*,
 215 F. Supp. 3d 62 (D.D.C. 2016)..........................................................8

*Farmer v. Brennan*,
 511 U.S. 825 (1994)..........................................................................8, 16

*Monell v. Department of Social Services*,
 436 U.S. 658 (1978)...........................................................4, 7, 14

*Westmoreland v. Butler County*,
 29 F.4th 721 (6th Cir. 2022) .......................................................4, 7

## Statutes

42 U.S.C. § 1983 ..................................................................................4

Prison Rape Elimination Act, 34 U.S.C. § 30301 et seq. ................................*passim*

**Other Authorities**

Allen J. Beck, Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ
241399, *Sexual Victimization in Prisons and Jails Reported by
Inmates, 2011–12 — Supplemental Tables: Prevalence of Sexual
Victimization Among Transgender Adult Inmates* tbls. 1–2 (2014),
https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.................................11, 12

28 C.F.R. § 115.13 ...................................................................................13, 14

Fourteenth Amendment ...................................................................................4, 7

## STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE

The National Center for LGBTQ Rights ("NCLR") is a national non-profit legal organization dedicated to protecting and advancing the civil rights of LGBT people and their families through litigation, public policy advocacy, and public education. Since its founding in 1977, NCLR has played a leading role in securing fair and equal treatment for LGBT people and their families in cases across the country involving constitutional and civil rights, including in prisons and jails.

GLBTQ Legal Advocates & Defenders ("GLAD Law") is a legal rights organization that seeks equality for all persons under the law regardless of their sexual orientation, transgender status, or HIV status. Since 1978, GLAD Law has worked nationally through strategic litigation, public policy advocacy, and education. GLAD Law, with partners, is currently litigating a number of cases to protect vulnerable transgender incarcerated individuals and has an enduring interest in ensuring the equal and accurate application of the law to such individuals.

Advocates for Trans Equality ("A4TE") is a nonprofit organization seeking to end discrimination against transgender people. A4TE's work includes a wide range of effort through policy and litigation advocacy, including support for the rights of justice involved transgender individuals.

Amici have an interest in the correct application of the deliberate-indifference standard to vulnerable detainees. That standard is individualized: it asks what a

1

reasonable official should have recognized about the particular detainee before him. The district court granted summary judgment without considering whether the jail's failure to provide adequate staffing and monitoring was itself an obvious source of risk to a detainee as vulnerable as Gray, whose vulnerability was recorded in the jail's own files. Amici offer two points bearing on that question. First, federal data confirm what Gray's own documented circumstances already showed, that a visibly feminine transgender detainee held among men faces a real and recognizable risk of sexual assault. Second, the Prison Rape Elimination Act and its regulations identify the safeguards (adequate staffing and video monitoring) needed to prevent custodial sexual abuse. While falling short of them does not itself establish liability, they are evidence of the obviousness of the risk and of what reasonable officials should have done.

## STATEMENT REGARDING AUTHORSHIP AND FUNDING

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici curiae state that no party's counsel authored this brief in whole or in part, and that no party, no party's counsel, and no person other than amici curiae, its members, or its counsel contributed money intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

At the time of the events in this case, Jamie Gray, a pretrial detainee who was transitioning from male to female under a physician's care, was taking prescribed feminizing hormones, had developed breasts, and presented as a woman.[1] Housed among male inmates, Gray was repeatedly harassed by staff and other prisoners, denied basic privacy, and ultimately sexually assaulted by a corrections officer who later pleaded guilty to a sex crime.

Gray's claim arises under 42 U.S.C. § 1983. Because he was a pretrial detainee, it is governed by the Fourteenth Amendment, and this Court applies an objective standard: whether an official recklessly failed to act with reasonable care to address a risk the official knew or should have known was excessive. *Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021); *Westmoreland v. Butler County*, 29 F.4th 721, 728–30 (6th Cir. 2022). The local government is liable, under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), only if its own failure to act reflected deliberate indifference, which a plaintiff may prove in either of two ways: by a pattern of similar prior incidents that put the government on notice (the pattern route), or by showing that the need to act was so obvious that the failure to act was itself deliberately indifferent, even without a pattern (the obviousness route). *City of*

---

[1] Gray has since abandoned that transition and now uses masculine pronouns; consistent with the plaintiff's own briefing and the decision below, this brief refers to Gray as "he."

*Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989); *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997).

The district court granted summary judgment to both defendants. Amici write to address one important error in that ruling: the court never considered the obviousness route as applied to staffing and monitoring. It never asked whether the jail's failure to provide adequate staffing and functioning cameras was itself an obvious source of risk to a detainee as vulnerable as Gray. The principal brief shows that the record established a pattern of prior incidents. In addition, and independently, even without a pattern, a reasonable jury could find that leaving a manifestly vulnerable detainee in unsupervised, unmonitored conditions posed an obvious danger, and federal law confirms it. Through the Prison Rape Elimination Act, Congress and the Department of Justice have recognized that custodial sexual abuse is foreseeable and that adequate staffing and monitoring are required to prevent it. That is a need this facility did not meet.

**First**, a reasonable jury could find that the need to protect Gray from a foreseeable sexual assault was obvious. At the time, he was transitioning, was taking prescribed feminizing hormones, had developed breasts, presented and was perceived as a transgender woman, and was housed among male inmates. His fear and mistreatment were repeatedly recorded in the jail's own files. Amici do not contend that transgender status alone establishes a constitutional violation. But when

5

a detainee's appearance and circumstances make his heightened risk of sexual assault apparent to anyone who encounters him, the need to take protective measures is "plainly obvious," and a municipality's failure to adopt any can be deliberately indifferent.

**Second**, the Prison Rape Elimination Act and its implementing regulations identify the safeguards (adequate staffing and, where applicable, video monitoring) that the Department of Justice determined are needed to prevent custodial sexual abuse. This facility had neither: it was chronically understaffed and had known camera blind spots, one of which the assaulting officer exploited. PREA creates no private right of action, and a mere shortfall would not establish a violation. But its standards are evidence of the obviousness of the risk and of what reasonable officials knew was necessary, and this facility's wholesale disregard of them (maintaining no adequate staffing, no functioning monitoring, and no PREA protocols at all) is evidence from which a jury could find deliberate indifference.

For these reasons, the judgment should be reversed and the case remanded for trial.

## ARGUMENT

This appeal comes from a grant of summary judgment to the defendants. The question on appeal is therefore not whether Gray will ultimately prevail, but whether the record, viewed in the light most favorable to him, would permit a reasonable jury to find in his favor, a question this Court reviews de novo.

Two settled principles frame that question. First, because Gray was a pretrial detainee, the Fourteenth Amendment governs his failure-to-protect claim under an objective standard: he need not prove that any official subjectively knew of the danger, but only that a defendant recklessly failed to act with reasonable care to mitigate a risk the official knew or should have known was excessive. *Brawner*, 14 F.4th at 596–97; *Westmoreland*, 29 F.4th at 728–30. Second, a municipality is liable under *Monell* for failing to adopt needed policies when that failure reflects deliberate indifference. A plaintiff may prove that indifference through a pattern of prior violations (the pattern route) or, even without a pattern, by showing that the need to act was so obvious that the failure itself is culpable (the obviousness route). *Canton*, 489 U.S. at 390 & n.10; *Brown*, 520 U.S. at 409. Both turn on the obviousness of the risk and of the need to act: the question the district court did not reach as to staffing and monitoring, and the one this brief addresses.

## I. A REASONABLE JURY COULD FIND THAT GRAY'S VISIBLE, DOCUMENTED VULNERABILITY MADE THE NEED TO PROTECT HIM PLAINLY OBVIOUS.

### A. The deliberate-indifference inquiry turns on the obviousness of the risk to a vulnerable detainee.

The governing principles come from *Farmer v. Brennan*, 511 U.S. 825 (1994), a case that itself arose from the rape of a transgender woman housed in the general male population. *Farmer* establishes that a detainee's particular vulnerability bears directly on the deliberate-indifference inquiry, and that a factfinder may infer knowledge of a substantial risk "from the very fact that the risk was obvious." *Id.* at 842. This Court has applied that principle to require officials to protect detainees who are vulnerable "either because of characteristics particular to [the] individual inmate or because [officials] know a predator has access to a vulnerable population," with vulnerability shown by inference from circumstantial evidence. *Bishop v. Hackel*, 636 F.3d 757, 766–68 (6th Cir. 2011). And courts have recognized that a person living and presenting as a transgender woman is "particularly vulnerable to sexual attack" in a men's facility, such that a factfinder may infer officials knew of the substantial risk she faced. *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 73, 77 (D.D.C. 2016). Under the objective standard that governs Gray's claim, the point is more direct still: he need not prove that any official actually knew of the danger, only that a reasonable official should have, and an obvious risk is one a reasonable official should recognize.

8

Amici do not argue that transgender status, by itself, makes out a constitutional violation, or that every transgender detainee has a claim. The argument is about *this* detainee: his vulnerability was visible to anyone who saw him, and a reasonable jury could find that it made the need to protect him obvious. The district court did not address whether the failure to provide that protection (adequate staffing, supervision, and monitoring of a facility holding a manifestly vulnerable detainee) was itself an obvious source of risk, though its absence is what left an officer free to assault Gray undetected in a camera blind spot.

**B. The defendants' own records documented the specific facts that made Gray's vulnerability visible and obvious.**

This is not a case in which a detainee's vulnerability was hidden or had to be pieced together from subtle cues. The defendants' own files (intake forms, medical records, and incident reports) documented, repeatedly and in real time, the characteristics and warning signs that made Gray a foreseeable target. The record establishes the following, all of it known to jail personnel before the assault.

*His transition and feminine presentation were known and recorded.* At the time of his incarceration, Gray was transitioning from male to female under the care of his physician and presented as a woman. (Gray Dep. at pp.16–17, R. 52-2, Page ID # 438.) He had developed breasts, had been receiving prescribed feminizing hormone therapy for roughly six months, and the jail refused to continue it. The jail's own medical intake reflected this: although one Corizon Health assessment marked

9

his sex as male, a staff member recorded that Gray "identif[ies] as" female, and the records referred to Gray in both masculine and feminine terms. (Compl., R. 1-1, Page ID # 11.)

*Staff documented escalating harassment and his distress, in his own words.* Within weeks, a jail medical provider recorded that Gray was "tearful" and could not use the toilet "due to men masturbating at her," that command staff had been notified, and that he was not permitted to cover his cell window. (Compl., R. 1-1, Page ID # 11.) Days later he reported that an officer had said "heinous" and transphobic things to him. (Compl., R. 1-1, Page ID # 11.) One officer told him that his "genes [were] fucked up and that being transgender was not natural." (Compl., R. 1-1, Page ID # 12.) Other incarcerated people were permitted to sexually harass him so persistently that he had to be relocated. (Gray Dep. at p. 34, R. 52-2, Page ID# 440.) Jail staff acknowledged that Gray complained repeatedly about his treatment by both officers and other prisoners. (LeMonds Dep. at pp. 49–50, R. 52-7, Page ID# 496–97.)

*Gray was denied the basic protective measures he expressly requested.* Gray asked to block the line of sight into his cell so that others could not watch him change or use the toilet; officials refused. (Compl., R. 1-1, Page ID # 12.) He was forced to undress and shower in view of other incarcerated people, and was reprimanded when

10

he attempted to screen the shower stall with paper. (LeMonds Dep., Ex. 10 at p.18, R. 52-11, Page ID# 529.)

Each of these facts was contemporaneously known to jail personnel and preserved in the jail's own records. Taken together, they describe a detainee whose heightened risk of sexual victimization was not merely foreseeable, but repeatedly flagged by medical staff, by incident reports, and by Gray himself. A reasonable official confronting this record could not plausibly claim ignorance of the danger; at a minimum, a jury could so find. It is against this individualized backdrop, not in its absence, that the federal data discussed below should be read.

**C. The danger was not speculative: federal data confirm that detainees who present as Gray did face acute risk, particularly from staff.**

The risk those facts signaled is neither speculative nor unique to this case. The danger faced by a transgender woman who is visibly feminine and housed in a men's facility is among the best-documented risks in American corrections. The Department of Justice's Bureau of Justice Statistics, whose data collection Congress mandated through PREA itself, has found that transgender inmates report sexual victimization at rates dramatically higher than other inmates:

> Across federal data, roughly 4% of prison inmates and 3.2% of jail inmates reported sexual victimization, compared with approximately 40% of transgender prison inmates and roughly 27% of transgender jail inmates. Among transgender jail inmates, approximately 18% reported sexual misconduct by facility staff specifically.

Allen J. Beck, Bureau of Justice Statistics, U.S. Dep't of Justice, NCJ 241399, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12 — Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates* tbls. 1–2 (2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf. That staff-misconduct figure is not incidental to this appeal; it is central to it. Gray was assaulted by a corrections officer, the very category of perpetrator that the data identify as a disproportionate threat to transgender women in jails. These figures are offered not to convert a statistic into liability, but to confirm what Gray's own appearance and circumstances already signaled: his risk was real, serious, and of a kind that competent corrections administrators are charged with recognizing. A jury could find that a detainee so situated (visibly feminine, hormonally transitioning, housed among men, and the documented target of harassment) presented an obvious danger that these data make impossible to dismiss as speculative.

### D. Under the objective standard governing pretrial detainees, the need to staff and monitor the facility was plainly obvious.

Applying that objective standard, the question is whether a reasonable official should have known that holding a visibly feminine, hormonally-transitioning detainee among male inmates, in a chronically understaffed facility with known camera blind spots, posed an excessive risk of sexual assault. The district court did not address that question. It did not analyze whether the failure to provide adequate staffing and monitoring was itself an obvious source of risk to a detainee in Gray's

12

position. A reasonable jury could find that need "plainly obvious," *Canton*, 489 U.S. at 390 & n.10, and that the failure to provide it was deliberately indifferent. The principal brief shows that the record established a pattern of prior incidents; but the need here was obvious even without a pattern—the obviousness route, recognized in *Canton* and *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011). This is an individualized conclusion about a detainee whose vulnerability was visible and documented; it neither requires nor invites any rule that transgender status alone suffices.

## II. PREA AND ITS REGULATIONS ARE EVIDENCE OF THE NEED FOR ADEQUATE STAFFING AND MONITORING, AND A JURY COULD FIND THAT THIS FACILITY GROSSLY DISREGARDED THAT NEED.

### A. PREA's supervision-and-monitoring standard requires a documented staffing plan providing adequate staffing and video monitoring to protect detainees against sexual abuse.

Congress enacted the Prison Rape Elimination Act, 34 U.S.C. § 30301 et seq., on the express finding that sexual abuse in detention is pervasive and underaddressed. The Act's national standards, promulgated by the Department of Justice, translate the general duty to protect into concrete, mandatory practices. Foremost among them, the supervision-and-monitoring standard requires every facility to develop, document, and make best efforts to comply with a staffing plan that provides for adequate levels of staffing and, where applicable, video monitoring, to protect inmates against sexual abuse. 28 C.F.R. § 115.13(a). The facility must

13

document and justify any deviation from that plan, must reassess the plan and its monitoring technology at least annually, and must have supervisors conduct unannounced rounds to deter staff sexual abuse. *Id.* § 115.13(b)–(d). These are not aspirational goals. The Department of Justice adopted them because it recognized that sexual abuse in custody is a foreseeable, recurring danger, and that adequate staffing and monitoring are needed to prevent it.

**B. Although PREA confers no private right of action, its standards are evidence of the foreseeability of the risk and of what reasonable officials should have done.**

Amici do not contend that PREA itself creates a cause of action; it does not, and appellant does not argue otherwise. But the absence of a private right of action does not strip the standards of evidentiary force. PREA's standards are relevant evidence of what reasonable corrections practice requires and of what officials were on notice to do. They therefore bear on both the objective-reasonableness inquiry under *Brawner* and the deliberate-indifference inquiry under *Monell*: evidence that a facility disregarded these federal standards does not by itself prove a constitutional violation; negligence is not enough. But a wholesale disregard of them is evidence of the reckless disregard those inquiries require.

14

**C. A jury could find that this facility grossly disregarded those safeguards, maintaining neither adequate staffing nor functioning monitoring and adopting no PREA protocols at all.**

Measured against the safeguards PREA identifies, a jury could find deliberate indifference. The facility was severely understaffed: a U.S. Department of Justice National Institute of Corrections report found roughly 115 of 278 positions unfilled in 2022. (Response to Defs' Motion for Summary Judgment, Ex. 3 at p. 3, R. 52-4, Page ID # 456.) And the facility had known gaps in its video monitoring: the director acknowledged, before Gray's assault, that the jail had camera "blind spots" and that those blind spots "could" affect inmate safety. (Farmer Dep. at p. 12, R. 52-5, Page ID # 467.) The officer who assaulted Gray exploited precisely such an unmonitored gap. The current director later conceded that the presence of a second officer on the unit that night "would probably have prevented" the assault. (Colvin Dep. at p. 57, R. 52-6, Page ID # 486.)

On top of these deficiencies, the director implemented none of the PREA protocols the jail's own policy manual directed her to establish, apparently believing that PREA's mere existence sufficed. (Farmer Dep. at pp. 15-17, R. 52-5, Page ID # 468.) These were not technical lapses. The facility maintained none of the safeguards PREA identifies as needed to prevent custodial sexual abuse and adopted no protocols at all, a wholesale disregard from which a jury could infer the reckless

15

indifference the standard requires, and could find a moving force behind Gray's assault. *Brown*, 520 U.S. at 404, 409.

*Canton* and *Connick* recognize that a municipality can be deliberately indifferent even without a prior pattern, where the need to act is obvious. The decision below would erase that route, treating the pattern inquiry as the whole of the deliberate-indifference question and never reaching obviousness. Preserving the route asks for no expansion of municipal liability. It is narrow, reaching only a detainee whose vulnerability was obvious and documented in the government's own records and who was held without the basic safeguards federal regulation identifies as necessary. So confined, it is not unique to transgender detainees: it protects any detainee whose heightened risk is apparent, and it reflects the rule that the duty to protect is most exacting where the State has stripped a person of the means to protect himself. *Farmer*, 511 U.S. at 833.

16

## CONCLUSION

A reasonable jury could find that the need to protect a visibly vulnerable detainee like Gray from a foreseeable sexual assault (by staffing, supervising, and monitoring the facility with reasonable care) was plainly obvious. Because a reasonable jury could find that the defendants should have recognized the need to act and were deliberately indifferent to it, summary judgment should not have been granted. Amici curiae respectfully urge this Court to reverse and remand for trial.

Dated: June 17, 2026

Respectfully submitted,

/s/ Sarah Prescott

AMY WHELAN
SHANNON MINTER
NATIONAL CENTER FOR LGBTQ
RIGHTS
1401 21st Street #11548
Sacramento, CA 95811
(415) 392-6257
awhelan@nclrights.org
sminter@nclrights.org

SARAH PRESCOTT (P70510)
*Counsel of Record for Amici Curiae*
SALVATORE PRESCOTT PORTER &
PORTER, PLLC
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplaw.com

*Counsel for Proposed Amici Curiae*

17

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because, excluding the parts exempted by Rule 32(f), it contains 3,484 words. An amicus brief may not exceed one-half the maximum length authorized for a party's principal brief; counsel should confirm the applicable word limit and insert the verified count. This brief complies with the typeface and type-style requirements of Rule 32(a)(5)–(6) because it is set in 14-point Times New Roman, a proportionally spaced typeface.

Dated: June 17, 2026

> */s/ Sarah Prescott*
> SARAH PRESCOTT (P70510)
> *Counsel of Record for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on June 17, 2026, I electronically filed the foregoing with the

Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using

the CM/ECF system, which will serve all counsel of record.

Dated: June 17, 2026

/s/ *Sarah Prescott*
SARAH PRESCOTT (P70510)
*Counsel of Record for Amici Curiae*

19